case number 20-5419 Donald Middlebrooks versus Tony Parker at all. Oral argument is not to exceed 30 minutes per side. Mr. Tenet for the appellant. Good morning, your honors. May it please the court. I'm here on behalf of Mr. Donald Middlebrooks. I think this is a traditional, not particularly complicated sufficiency of the pleadings case under Bell Atlantic versus Twombly. I think the issue is whether Mr. Middlebrooks has plausibly pled facts that overcome the Tennessee defense of Ray's judicata under Tennessee law. That Mr. Middlebrooks is on death row matters to some extent. Where important human values are at stake, even a slight change in circumstances may overcome Ray's judicata, cautions the U.S. Supreme Court in Whole Women's Health from 2016. But beyond that, this is a pleadings case. My best laid plans, I'm going to address three things today. First, I'm going to quickly address the procedural history of this case dating back to the inception of lethal injection. I'll do that quickly. Secondly, then examining Ray's judicata in relation to that in regards to the key question, did Abdur Rahman's decision in 2018 that pentobarbital was not a feasible alternative method of execution preclude a claim that pentobarbital is a feasible method of execution today? And third, I'm going to discuss when personal as applied Eighth Amendment challenges become right, whether they ripen repeatedly with every change in protocols or whether they only become right when the issue ceases to be hypothetical and when an execution date is actually sought. So quickly, the background. In 1998, the record reflects this, Tennessee adopted lethal injection. By 2000, it was a default method. Over the next two decades, at least three different chemical combinations were employed, five separate protocols were enacted, and four different facial challenges were lodged. By 2017, we have West versus Schofield, which upholds against a second challenge, a pentobarbital single drug protocol and finds it to be constitutional. Nine months after West versus Schofield in January of 2018, Tennessee amends their protocol to make it an either or system. They keep pentobarbital single drug as a constitutional option, but they add in the three drug midazolam protocol. The plaintiffs, which include Mr. Middlebrook and include me as an attorney, challenge this alternative. And we submit that the pentobarbital protocol under the analysis of Bayes and Glossa significantly reduces the substantial risk of severe pain that would be only the one drug protocol can be used. All of this gets rushed to trial. So protocol is in January of 18. By July of 18, we are in trial. I think the record reflects that we have Boston, Auburn, Alabama, Tulsa, Oklahoma, and Miami, Florida, all who have to be deposed before trial. So this is all going on in this rushed basis. Four days before trial, the Tennessee Department of Corrections amends their protocol again and removes the pentobarbital alternative. Does the record reflect why they removed pentobarbital? So Abdur Rahman, the opinion, cites to the testimony of the commissioner and deputy commissioner and broadly, I think in the record before us, just recites that they testified that they could no longer obtain pentobarbital. I think the underlying trial record is a little bit more developed on that. But their testimony was accredited. I would submit the basis for the Tennessee Supreme Court's finding that pentobarbital was not proven by the plaintiffs to be a feasible alternative. And on that ground and that ground alone, we lost. And so that brings us to the key question. Does that determination based on the testimony of the commissioner and deputy commissioner that as of July 2018, they no longer could obtain pentobarbital, does that preclude a suit today based on the current availability of pentobarbital? And in answering that question, I'd like to focus on a case that is in our briefs, yesterday in preparing for argument. This case just stood out to me. It involves alligators, but it involves facts that are directly on point with our situation. White is a Tennessee Supreme Court decision from 94, and it recites the same standard that banks had set forth 60 years earlier, and that Creech reiterated 15 years later. And it says judicata extends only to the facts and issue as they existed the time the judgment was rendered. And again, it observes that if the facts have changed or new facts have occurred that may alter the legal rights or relation of the litigants, a new suit may go forward. That's the standard. But the reason White stood out to me is it applies the standard in a situation that's really close to our own. So in the early 80s, the husband disappeared in 30 feet of water in Louisiana. He couldn't swim, and the water was filled with alligators. His body was never found. His wife submitted he was dead and attempted to claim on the insurance policy, the life insurance. Case went to trial in 1985. Dates are incredibly important. There's only two of them. 1985, the case went to trial, and the jury was asked as of the conclusion of trial, August of 85, had the wife proven that her husband was dead? And they concluded she had not proven he was dead. Five years later, a new suit was made to claim the life insurance. The new suit, very interestingly, said no new facts have evolved other than the husband hasn't been found in five years. But they said that's the only new fact, period. Though there was one other issue, of course. They were trying to claim on the life insurance policy which ran through 1986, not 85 through 86. And so the Tennessee Supreme Court in saying Reyes-Judicata did not bar this new suit, it was based on only one new fact. He hadn't been found in five years. They said the issue litigated at the first trial and the issue alleged in the present suit are not the same. The first one was whether he was dead by August 7th of 85. However, now we have to decide whether he died before the insurance policy lapsed in 1986. And there is a new fact that a jury could consider, which is that he has never been found alive. I submit that that's legally identical to our situation. The issue is not whether the commission could obtain pentobarbital in July of 2018. The issue is whether we have pled that pentobarbital is a feasible alternative to the three drug protocol as of today. And I contrast this with a typical civil suit. Most suits are backward looking. Was a driver at fault? Let me ask you this. Based on that argument, you can never have Reyes-Judicata because the supply of the drug could be, the availability and supply of the drug could constantly be changing all the time. And that would mean that Reyes-Judicata would be impossible, wouldn't it? I don't think so, Your Honor. I think it is a valid concern. And it's one of the reasons that I submit that a jury could consider. The analysis designed by the U.S. Supreme Court is a comparative one. And it always begs us to question whether a new alternative or a newly available alternative or newly feasible alternative causes a comparatively lesser risk of substantial pain. No doubt that's the standard. I think the existence of an alternative is inevitably an ever-changing ground. Let me ask you this to say whether or not we would have Reyes-Judicata and it's previously been claimed by the state that the drug was unavailable. I shouldn't call it a petitioning because we're not here in habeas. I guess we're here under Section 1983. Would there have to be some showing by your client that the drug was now available? Or would that be irrelevant? Oh no, no, absolutely. I think that the standard that we have to meet is set forth in Bucklew and in light of White. White did require there to be new facts. It didn't take much under Tennessee law in White. A five-year absence was the standard. And it says what we need to do as a prisoner may point to a well-established protocol in another state as a potentially viable option. That's the pleading requirement at this stage I would submit. Then the U.S. Supreme Court goes on and says, of course, in a case like that, a court would have to inquire into the possibility that one state possessed a legitimate reason for declining to adopt that protocol. That's a post-complaint issue. But I absolutely agree with your honor that some new facts must be included in the complaint. And I think we've included five paragraphs with averments related to 2019 specifically. I mean, we've included more that go back. And I think that all of those facts are significantly more than what was enough in White. And in fact, if you were to step back and look at this case, I suggest actually we should. Have we pled a feasible alternative under Bucklew? Let's not look at raised judicotics. It's really a different issue. Have we pled a claim under Bucklew that as of today, pentobarbital is a feasible alternative? And I submit we have. You say it's just a pleading, a matter of pleading, but as a threshold matter, would we need that? Would we as the court need to look at whether there's a factual basis for the contention that the drug is available or that other states were had access to the drug, even though this state is claiming they couldn't get it? What would you say about that? Well, I think that that is governed by Bell Atlantic and our allegations plausible and not conclusory. And to me, the conclusion obviously is that pentobarbital is presently available. The facts that lead up to that are the United States Attorney General saying it's widely available. The United States Bureau of Prisons announcing they have a domestic supplier. And I'm looking at my complaint. Obviously, some things have happened in 2020 that postdate the complaint, but that it was being used regularly throughout 2019. I think most importantly is the change in the regulatory environment regarding import. A pre-19 fact is back in 2017, Tennessee had identified a foreign supplier of pentobarbital. That, of course, didn't do them any good until import licenses became available. We have argued or set forth in our complaint that import licenses now are available. Arizona and Nebraska have both obtained import licenses, and Ohio has a application pending. This, of course, goes back to the Office of Legal Counsel opinion, which said that the Federal Drug Control Act no longer could be used to restrict executions. And that is, I think, what brings us to two incredibly important developments in U.S. Supreme Court law. The first, from July of 20 and October of 20 in Barr v. Perky and Barr v. Hall, the U.S. Supreme Court twice said effectively that the OLC opinion is correct, and the Federal Drug Control Act does not apply to restrict executions. And they permitted two executions to go forward with pentobarbital, overturning FDCA injunctions on execution. So that makes clear that while years past the import of the OLC opinion was debatable, it no longer is. Tennessee can import, and that is a completely new fact today. And then secondly, you know, when we talk to, Buckley says we have to point to an alternative used in another state. We haven't pointed to a alternative. We pointed to the alternative that in Barr v. Lee, the United States Supreme Court recognized was the mainstay of state executions, mainstay. They discussed over 100 executions without incident. They discussed multiple courts that upheld it. And they rhapsodized about how it was the most important method of execution available. And that was one of the reasons they allowed it to go forward in Barr v. Lee. So you're referring to Barr v. Lee, and you said 100 executions had successfully gone forward. Those were 100 with pentobarbital? That's what the U.S. Supreme Court says in Barr v. Lee, is they say over 100 executions without incident. I haven't bought it. Was that dealing with all forms of lethal injection or just with pentobarbital? They were saying just with pentobarbital. They said single-dose pentobarbital has become a mainstay of state executions, and they went on for about a page of their opinion discussing its virtues. So I respectfully submit that these U.S. Supreme Court developments, coupled with the new facts that we've alleged, in light of the fact that states can now legally import pentobarbital, plausibly sets forth a new claim, one that is not precluded by a finding that pentobarbital wasn't available in 2018, but a new claim today that it is available circa, I guess, now it's 2021. So with that, if I may, I'll move on to the ripeness of as-applied challenge. I think personal method of execution cases are very rarely right under Tennessee law. The Tennessee Supreme Court has made clear they do not like to engage in hypothetical litigation over methods of execution. Twice in the easier facial challenge arena, they have rejected electrocution challenges as being unright, because they said it's hypothetical that the alternative of execution will be used, because it required some intervening event, that frankly, the state being unable to get a lethal injection drug before electrocution would go forward. Of course, the state keeps pleading they have trouble getting lethal injection drugs. Nonetheless, the Tennessee Supreme Court says that until they formally announce that they must execute someone in the electric chair, which would happen 20 days before their electrocution, by the way, until they make that formal announcement on the eve of an execution, the electric chair challenge isn't right. So I want to compare that, if that's hypothetical, if it's hypothetical that inmates are not, who knows whether anyone will be killed in the electric chair. Let's talk about how hypothetical it is that any given inmate will be killed under any given protocol. So we've had five different lethal injection protocols using three different variations of drugs. That's just in Tennessee, okay? During the same time period that Mr. Middlebrooks has been on death row, other states have either implemented or discussed implementing the firing squad, hanging, and nitrogen hypoxia. So we have all of these different varieties of execution that are constantly being discussed. And the reality is back in 98, 2000, 2005, 2012, any suit, in fact, that Mr. Middlebrooks had filed at that time would have turned out to be hypothetical because they all would have involved protocols that are no longer employed. What about the feature that Mr. Middlebrooks' challenge has to do with his epilepsy, seizures, and mental state, which would pertain to any form of lethal injection? Your Honor, I think there's two important issues there. First, remember, these are things that have been with him for a while, and they can get worse and they can get better. Medical science changes. And we simply, in 1998, would not have known where Mr. Middlebrooks' condition would be. I mean, one might presume with age they might degenerate, but sometimes mental disorders get better. I'm not a doctor. I'm just saying from experience, one observes that things go in two different directions. And more importantly, the medications we use to treat such disorders are forever evolving. So again, not speaking as a doctor, but just as a lay person, the medications that we would expect to try to use to overcome his seizure disorder in 1998 versus 2021, I'm going to suggest are radically different. And therefore, you know, let's say we And we were discussing the then state-of-the-art for managing a seizure disorder. Would those findings be relevant 16 years later? I'd suggest that it would have been a waste of judicial resources to have engaged in that suit, to have employed those experts, and then to have to come back today when we have a different state of his condition, different circumstances. Heck, we have different methods of even employing the IVs. What makes his suit ripe now if a suit challenging electrocution wouldn't be right now? And if, as you say, his condition may change and the medical treatment may change before he actually is executed? I think that that's the way we typically triangulate with whatever arguments the state may lodge against us. So if we don't lodge the suit, we have waited too long. If we do lodge the suit, it's not right yet. Whatever we do tends to be pled against as having been the wrong thing. So here we have a bright line. They sought his execution. The only other possible bright line is the 20-day notice they on the eve of execution. And the United States Supreme Court has repeatedly condemned death penalty litigants who wait till 20 days before an execution to file process. So in light of that, it seems like the most prudent thing for Mr. Middlebrooks to do was to wait until an execution date was sought, which meant an execution date at the time they sought it, either months or within a year or so. COVID obviously has changed things. So when was his execution date announced and what is his execution date? Your Honor, he does not have one. They sought one and then we went on hold and we have a number of dates that have been postponed and we have a number of other dates that are in limbo right now. At the time we filed the suit, I don't think we would have expected that limbo. You filed the suit at a time when the state had sought an execution date. Is that correct? Yes. But the state had not obtained an execution date. Yes. I don't remember how many dates were sought, but the Tennessee Supreme Court granted dates, I believe in eight cases and in roughly another eight cases did not immediately schedule dates. For whatever reason, under Tennessee's process, they normally schedule dates at two-month intervals, six a year, and so they scheduled eight out. And as I say, COVID has derailed that particular schedule. So I think I may be getting a little bit confused about the timeline, but he was part of the initial suit, right? He was part of the facial challenge. Yes, Your Honor. So why was it right then? I think the reason it's right in a facial challenge is while it using any particular protocol, it was absolutely clear that some inmates were going to be executed. In fact, when that suit went forward, Billy Ray Eyrick had a date in August, which was why we were trying to get everything done in July in the trial courts so that a ruling could be made relevant to his execution. And then Edmund Zagorski had an execution in October, which was So while Mr. Middlebrooks arguably didn't have a right facial challenge, I don't think there was any harm to anyone. Because remember, rightness is a two-part analysis under Tennessee law. The second part of it is hardship to the parties. So it was much more expedient in light of Mr. Eyrick and Mr. Zagorski having right facial challenges for other inmates to join in that But you're talking about Abderrachman and the facial challenge, right? Yes, I am. I absolutely am. So but was an applied challenge raised in the Abderrachman case by anybody? I believe plaintiffs from the Eastern District of Tennessee at some point did file as applied challenges. I honestly apologize, Your Honor. I don't believe anyone litigated it before Chancellor Lyle. But I believe separate as applied challenges were lodged based on people with imminent execution dates. Indeed, I believe with individuals who have been executed. But the distinction that you would draw because the question is if Tennessee thought in its Supreme Court decision in Abderrachman, if it thought that the challenges to the method of right, would that be a binding decision on us? But you're saying that at least vis-a-vis Mr. Middlebrooks, he did not raise an as applied challenge in Abderrachman? No. I'm trying to recall the opinion. I know I can look at it. But did Abderrachman say it was resolving only the facial challenge? Yeah, there was only a facial challenge in before the Tennessee Supreme Court on that appeal. Let me ask you this. Your client's claim is right now and may not have been right previously. Why would you need to provide by way of pleading and supporting evidence some indication as to how your client's medical status or medical condition has changed over time or from one point to another point? How should we look at that issue? Your Honor, I think that we are grounding rightness on the imminence of execution. I think that we did plead that there was some indication of deterioration. But I think the years ago, that's not what makes it right today. What makes it right today is it is now actually imminent and no longer hypothetical that an execution will go forward. So I believe, no doubt, we have to plead grounds for an as applied challenge. But I don't think that that has to do with the rightness inquiry. I think the rightness inquiry is focused on the reality that execution using lethal injection, as opposed to electric chair, as opposed to whatever else, is now a legitimate probability in the near future. But have you raised an as applied challenge ever before? With Mr. Middlebrooks, no, Your Honor. No, not with respect to Middlebrooks. No. I see that your time is up. Do any of the judges have any other questions? No, I don't, not myself. No, thank you. Thank you. Thank you. Ms. Jones. Good morning, Your Honors. May it please the court. My name is Miranda Jones. I'm representing the defendants in this case on behalf of the Tennessee Attorney General's Office. The district court's conclusion that this case is barred by race judicata should be affirmed for two reasons. First, plaintiff has not alleged a single material new fact showing that pentobarbital is available for use in Tennessee executions. And second, plaintiff's as applied challenge has been ripe since 1998 and was certainly ripe, overripe even, when he was a party to the Obdurachman litigation in 2018. Plaintiff's counsel has done an excellent job setting out procedural history of this case, so I'm going to move forward into discussing the facial challenge that petitioner brings, or plaintiff brings, excuse me. With regards to the facial challenge, there are two key aspects for this court to consider. The first is whether Bucklew changed the Bayes-Glossop test. And the second is whether plaintiff has alleged new facts showing the availability of pentobarbital. Your Honors, Bucklew did not change the Bayes-Glossop standard and requirement for death row inmates contesting an Eighth Amendment claim about a method of execution. Under Bayes and Glossop, a death row inmate must first show that there is a method of execution that imposes an unnecessary and severe risk of suffering, and the plaintiff must also show an alternative method of execution that is simultaneously feasible and readily implemented. It's very important to bear those two components of the availability part in mind, because Bucklew focused on the second half. Bucklew focused on when a method of execution can be chosen among methods of execution that already exist under state law. And the reason the Supreme Court said this was to address precedent from the 11th Circuit, where the 11th Circuit had improperly interpreted Glossop and held that death row inmates alleging alternatives had to choose from pre-existing methods in their own states. The Bucklew Court said that is not correct. You can look to other states and their methods of execution when proposing an alternative in arguing that the alternative can be readily implemented. But Bucklew in no way changed the feasibility component of the available alternative test. Why is the complaint not adequate then, in that it lists in a number of different paragraphs a number of states that are using pent-a-barbital as the method of execution? Your Honor, that goes to show that the method of execution could be readily implemented, and that's something that Tennessee does not contest. Tennessee previously implemented pent-a-barbital, but that does not go to show that this method of execution is feasible. In fact, this Court in the 2019 opinion for NRA Ohio specifically reiterated that feasibility is also a component required under Bayes, Glossop, and Bucklew. So I don't, I still don't understand your answer. Why is it not feasible? I hear your words that it's not feasible. Yes, Your Honor, I'll happily delve into that. Plaintiff alleges eight facts that he claims show that pent-a-barbital is available for use in Tennessee. None of these facts show it is actually available for use in Tennessee. It is infeasible because pent-a-barbital is not available for use. In Plaintiff's complaint, there's a wide variety of conclusory statements, but Plaintiff's reply hones this down to eight specific facts that Plaintiff claims shows pent-a-barbital is available for use in Tennessee, and that goes to the feasibility component. Not one of those facts supports that conclusion. Plaintiff alleges that former Attorney General Barr might have said that pent-a-barbital was widely available. I would ask Your Honors to consider the public record on which that statement is based, the New York Times article, where there is no indication that General Barr actually said that. It is just a term used in the article. It's not clear that General Barr made that statement, but regardless of that, that is a conclusory statement. This Court cannot take a conclusory statement as a, as proof, as a fact. It's certainly not when statements are made by the Plaintiff, and it should no more apply when statements are made by third parties. You're saying then that if the United States Attorney General says that some drug is widely available, let's assume that that's exactly what the Attorney General said. Yes, Your Honor. That is not a reliable statement to show that a drug is available for use? That statement alone, no, Your Honor, because it's purely conclusory. If there were additional facts given by Attorney General Barr to bolster that statement, then those facts might be relied upon, certainly in the context of the complaint, if that's the basis of the pleading, but a purely conclusory statement is not sufficient to support a finding that pentobarbital is available for use. There were a number of other statements, which, of course, your opponent is arguing should be taken together, and it includes that five states, Georgia, Idaho, Missouri, South Dakota, and Texas use pentobarbital, and that since 2012, three of those states have conducted 109 executions using that protocol, and that there were 14 executions so far in 2019. Why are those not enough, then, to demonstrate Attorney General Barr's hypothetical statement that it's widely available? Your Honor, those are not a change in circumstances from the 2018 Ogda Rockman decision. All of those states had access to pentobarbital, or plaintiff does not allege that any of those states did not have access to pentobarbital during the 2018 Ogda Rockman decision by the Tennessee Supreme Court, and this court and the Tennessee Supreme Court and other courts have held that another state's, another system of government's access to a lethal injection chemical does not mean that the state at issue can also therefore gain access. That's a logical fallacy because certain states can acquire it in a very confidential manner that other, that the suppliers would not be willing to supply it to multiple states and risk exposure and discovery that they are supplying lethal injection chemicals. I'm curious what, I'm curious what you would think would be an adequate allegation in a complaint sufficient to meet Iqbal and Twombly. Well, certainly. That the drug is now available for use in Tennessee. The easiest would be, Your Honor, if plaintiff alleged that plaintiff was aware of a specific source that was willing to sell it for use in Tennessee executions. That would certainly meet the Twombly Iqbal standard, and plaintiff wouldn't need to name that source because the source's identity should remain confidential, but if plaintiff stated they found sources and one, two, five sources that had explicitly said they were willing to sell it for use in Tennessee executions, that would definitely be sufficient. So they would need, they wouldn't need, according to your statement here, they wouldn't need to name the precise source. Not. They would need to say that they have inquired of manufacturers of pentobarbital or the precursors to pentobarbital. And found that they have no objection to selling in Tennessee for executions. Is that right? Yes, Your Honor, with the understanding that at some point those sources would need to be identified, not in public pleadings, but privately in discovery to confirm that that is accurate. But in the initial pleading, an anonymous source that they can confirm would, legally meets the requirements as a pentobarbital supplier, all of the many regulations that suppliers must comply with and the requirements of Tennessee's protocol. There are specific requirements under Tennessee law as to how these lethal injection compounds must be made. If they have a source that is up to those qualifications and they allege that, then certainly that would meet the pleading requirements. And you're deriving the pleading requirement from Bucklew, Glossop, and Bayes. Is that right? Yes, Your Honor. I'm sorry. Do you agree that it's a plausibility standard? To the extent that they must allege facts that plausibly could, yes, that are in fact plausible, that show that it could be obtained. The facts alleged are materially no different from the facts in existence in 2018. So I'm trying to pin this down. Is your problem, A, the facts have not changed, therefore the predicate for avoiding race judicata is not present, or B, the facts may have changed, but the facts that you're alleging are insufficient to plausibly allege that it is now available? It's a combination of the two, Your Honor. The relevant facts have not changed. Certain facts have changed, but they are not sufficient to show it is available. Many of the facts alleged are business as usual, like this argument that five states are applying, continuing to use pentobarbital in their executions when they already were using it in 2018. The new fact that's been alleged, so there's a combination. There are facts that are business as usual. They're not technically new facts. And then there are a couple of new facts that have been alleged, which is that Tennessee's, the federal government is using pentobarbital in executions, or that there's an OLC opinion suggesting it might be possible to import. Those are new facts, but they do not show a change in legal circumstances to the amount that it would require race judicata to no longer apply. So it's not a brand new analysis of whether there's sufficiency of pleading under 12b6 regardless of race judicata. It's an analysis under Tennessee law. The question is, have the facts changed to the extent that the legal circumstances have changed from the prior case that has the race judicata effect? And we're alleging they have not. They may have alleged certain new facts, but those facts do not amount to a change in the legal circumstances of the case. So race judicata still applies. Your opponent was focusing on, at one point, on the importation issue. Can you address that? Has the law on importation changed? No, Your Honor. The law has not changed. The D.C. circuit in the Beattie case, I believe it was, imposed a permanent injunction on the FDA requiring the FDA to regulate the importation of lethal injection chemicals. The D.C. circuit in the 2020 opinion, late last year, I believe it was November 18th of last year, and this is an opinion that Plaintiff Sykes, in his reply brief, reiterated that standard and reaffirmed that that standard still binds the D.C. circuits and accordingly still binds the FDA. Plaintiff relies on two United States Supreme Court actions as somehow being evidence that this holding in the D.C. circuit is no longer good law. I would urge Your Honors to review Bar v. Hall and Bar v. Perkey because these are not Supreme Court opinions. They are one and two sentence orders that all they do, without any findings of facts or conclusion of law, all they do is reverse stays of execution. There is no basis given for the reversal of the stay, and it would be improper to infer from the Supreme Court's silence the basis for the Supreme Court's decision to overturn that stay. Until D.C. circuit law is explicitly overturned, it is binding precedent, and that remains law, prohibiting the importation of lethal injection chemicals. So where did, my understanding is that the federal government did use pentobarbital in executing these federal inmates. Where did they get it if they couldn't import it? Domestically. They had a domestic supplier, Your Honor. And so why doesn't Tennessee use that supplier? We do not know who that supplier is, Your Honor. The identity of lethal injection suppliers is kept highly confidential, and many states refuse to even discuss the topic with other states, much less delve into providing the identity of their suppliers. The fact that the federal government has access to a domestic supplier, if anything, is even less significant than a state having access to it, which we've already discussed is not compelling fact in and of itself because the federal government has far greater resources at its disposal to find a supplier willing to provide access to lethal injection chemicals. Individual states don't have the same level of resources to spend on trying to find a source that would be willing to provide these lethal injection chemicals and risk discovery and all of the various backlashes that are associated with that. When Tennessee, did Tennessee ever use pentobarbital in an execution? Your Honor, I know it was the method of execution in Tennessee for several years. I do not know if it was ever actually applied. I apologize. I'd be happy to supplement that with briefing, but certainly for a period of time, this was the method of execution in Tennessee. Was it the sole method at that point in time? Yes, Your Honor. So, so then any... Aside from execution, I mean, electrocution. Well, were people in fact electrocuted or not during that time period? I do not believe so, Your Honor. So if there were executions during that time period, they were with pentobarbital? Again, I believe so. I would be happy to supplement that briefing. I know it was a method of execution. I don't know if it was enforced. Can you address the as-applied challenge? Yes, Your Honor. The as-applied challenge that plaintiff brings turns on this idea that a pre-existing condition that was well-established at the time of plaintiff's criminal complaint demonstrates that he would suffer severe pain if he were executed using lethal injection. Now, this argument is already undermined by the claim that pentobarbital, a lethal injection, is a more humane alternative. But more to the point, this claim was ripe when Tennessee adopted lethal injection as method of execution in 1998. The basis on which plaintiff relies to argue that this claim was not ripe until an arbitrary point in time when the Attorney General's office moved to set the date of execution, the entire basis of plaintiff's argument is that plaintiff might have died before now, plaintiff might have gotten healthier before now, and Tennessee might have adopted a new protocol. Your Honors, none of those arguments go to ripeness. Ripeness is about the birth of the claim. The claim was born when the pre-existing factors necessary for the claim to exist, existed, and that is direct appeal was completed on the criminal process, so plaintiff was certainly going to be executed in Tennessee, and Tennessee had adopted a lethal injection and plaintiff's physical condition was established. If we could think about, Tennessee has had electrocution as a form of performing the death penalty, right? Yes, Your Honor. So when would an electrocution claim be ripe? An electrocution claim would be ripe when that is the method that is certified, the method that is going to be used to execute plaintiff. So has a method of lethal injection been certified to be the method that is going to be used to execute this plaintiff? Yes, Your Honor, by the simple fact that it is the default method of execution in Tennessee. Being a default method means that the method is certified? I probably shouldn't have used the word certified when I was trying to explain that, that's a misuse of the term on my point, but the default method is the ripe method, and that's why facial challenges to the default method are ripe. Execution by electrocution is not the default method, and therefore it is only ripe when it is clear that that is the method that is going to be used, and in order for that to be clear, the state has to either lack access to the necessary lethal injection chemicals that would be used in the default method, or the default method needs to have been found unconstitutional. Unless one of those two things happen, the claim is not ripe. So there's a legal, a clearly defined statutory precursor to electrocution being ripe. The same is not true with this as-applied challenge. The legal precursors that had to be established were the fact that he was going to be executed in Tennessee, which was established, I believe, in 1992 or 1993 when his direct appeals were expired, and that that was the method of execution in Tennessee, which was established in 1998. And the final component is not a legal precursor, it's a factual precursor, and that is plaintiff's physical condition, which was again established during his direct appeal. The arguments plaintiffs raise is for why this is not ripe all go to mootness. They don't go to the birth of the claim, they go to the death of the claim. Plaintiff's arguments that he could have died before now, that he could have improved, that Tennessee could have adopted a new protocol, those would all moot a ripe claim, but they would not render a ripe claim somehow unripe, or they would not render an unripe claim ripe. Those are all mootness arguments. And counsel, are you saying that the Tennessee courts, let's say somebody is sentenced to death. And, you know, hypothetically, the courts are 20 years, you're executing people 20 years later. You're saying that as soon as that person's judgment is final, they have to bring their challenge. And then the courts will adjudicate a challenge when the method of actual execution for that person and the timing of the execution are completely up in the air, because of the implied passage of time. Your Honor, at that point in time, the method of execution is not up in the air, it's established by law. I know, established by law. But as we can see, the method changes from time to time, depending upon what drugs are available. And drugs become available, become not available. Cases are decided that make certain drugs disfavored. And all of this happens over time. But are you saying that the Tennessee courts do consider claims regarding executions that history shows will not take place for a decade? Yes, Your Honor, depending on the nature of the as applied challenge. So if the nature of the as applied challenge turns on a method of execution that is in place at that time, it would be appropriate for the plaintiff to raise the as applied challenge under the method of execution in place at that time, because of the type of as applied challenge at issue. And there might be future methods of execution that change the as applied challenge, rendering it moot or creating a new as applied challenge. But what needs to be litigated is the state of the law in existence at the time that the as applied challenge is raised. Can you give me a couple of the Tennessee cases that have adjudicated those claims? Are there any Tennessee cases that say this isn't right? I'm not aware of a Tennessee case that says an as applied challenge to a death penalty protocol claim isn't right before a certain point in time. I'm not aware of one that says it is right. However, I am aware of the fact that in the Abdur Rahman litigation, plaintiffs had the opportunity to bring an as applied challenge. They simply brought it too late. I have yet to see a case that determines that at an arbitrary point in time, an as applied challenge becomes right. If you could clarify what you're saying about Abdur Rahman. You're saying that in Abdur Rahman, which involves approximately 30 plaintiffs, am I right? Yes, Your Honor. So what did the Supreme Court say about the ability or inability for those 30 people to raise as applied challenges there? Your Honor, this may have been a decision by the trial court, not the Supreme Court. I would have to double check. But I believe the Supreme Court did not clearly hold on the as applied challenges. But I believe the trial court properly dismissed certain as applied challenges because the parties attempted to raise them too late in the proceedings, indicating that if the plaintiffs had attempted to raise an as applied challenge in a timely fashion, they would have been able to litigate them. That is the extent of what I recall from the Supreme Court's discussion on the topic. But to get back to Judge White's question, in terms of a specific holding, either that as applied challenges to the method of lethal injection were right or were not right, you're not aware of any Tennessee Supreme Court decision one way or the other? No, Your Honor, not with respect to physical conditions alleged in this case. And part of that may go to just the unique nature of as applied challenges. They might not be that common. The facial challenge is a much more common approach because it's an argument that the death penalty is unconstitutional in general. Individuals have to have unique physical conditions that place them at jeopardy when bringing an as applied challenge. And that is just not as common as a general facial challenge that everyone might experience. Plaintiff does attempt to. But you can certainly see where a court might say, look, you know, what you say might be true. You might have conditions, but we don't know what your situation is going to be eight years from now when you're likely to be facing execution. So come back later. Your Honor, I can see that happening, and it would depend on the nature of the as applied challenge. For example, if it goes solely to the state of a mental condition that is highly changeable, that there is a basis for approaching that. And in fact, the competency test under Tennessee law competency is not right until execution is imminent. So, yes, if it's a very changeable condition like mental competency, that is a point that must be determined later. But what we have here is an established seizure condition. And what we have are allegations that this is a well-established, longstanding physical condition, and that at the time of plaintiff's criminal case, there was a well-established seizure condition that could be at issue. So this the physical condition was already established. If it's a different condition that may not be established is uncertain. There might be different factual circumstances to consider. But in this instance, what we have is an as applied challenge regarding a physical condition that was well-established. And the basis for which the claim that it's an unconstitutional method of execution arises is lethal injection specifically, not any one protocol, not some sort of specific chemical compound interacting with the inmate with unique physical conditions in a unique way. It is the simple act of lethal injection that is being objected to. And that claim was certainly ripe during the Abdo Rockman litigation. But your position says that it was ripe 20 years ago. Yes. However, this court doesn't need to reach that decision because the district court ruled solely on the basis of res judicata with regard to the Abdo Rockman litigation. So this court need only affirm the district court's decision, which we agree was correct in that regardless of when it was initially ripe, it was certainly ripe during the Abdo Rockman litigation in 2018. And to build on the point that we've been discussing about ripeness and mootness, plaintiff's argument that mootness must somehow be cabined within the four walls of a pre-existing case does not hold weight when you consider the cases cited. The doctrine of mootness can apply equally to a claim existing before litigation started and after litigation started. And the cases plaintiff cites are all discussing facts that arose after litigation started, but none of them stand for the proposition that a claim could be mooted prior to coming to a court. And this is relevant because if the court were to uphold plaintiff's argument that mootness alone is a basis for determining a claim is unripe, it would be an end run around res judicata. Because a plaintiff could argue at any point in time, oh, well, I just didn't wait long enough. With regards to a declaratory judgment action, oh, well, it just wasn't close enough in time. So I waited until this arbitrary point in time was closer because all of these things could have happened in the interim that would have mooted my claim. And that would prevent res judicata from having a finality effect in future litigation, particularly declaratory judgment actions. So this extension of the mootness doctrine poses a serious risk to finality. This extension of ripeness to somehow say that a claim can be unripe because it could at some point become moot prior to litigation being brought seriously jeopardizes both statutes of limitations and res judicata collateral estoppel. Across the board, there is a risk to the doctrines of finality by saying, I couldn't have brought my claim before now because I could have died before now. I'm curious about the competency point that you made earlier. So competency is something that should be raised at the end, according to Supreme Court precedent. Yes, Your Honor. Why should the adverse situation involving mental state, which is part of Mr. Middlebrooks' claim, why should that not be treated akin to competency? Your Honor, Mr. Middlebrooks has not alleged that this is a new development. He has not alleged that his mental state that he's currently experiencing and the risks created by it are. But does that have to happen with respect to a competency claim? You have to allege that all of a sudden you're not competent. No, Your Honor. Competency goes to a person's ability to be fit for execution. This argument goes to whether or not he would experience severe pain as a result of the use of lethal injection. And the argument that he already had this mental condition that causes him distress was in existence at the time that lethal injection was adopted as a bit of execution was certainly in existence during the Abderrachman litigation. But you're saying even the mental state claim existed back then, but the court wants the defendant to wait until it's imminent. Your Honor, the court, the distinction between as applied as to a mental state and competency is that competency goes to a person's ability to be executed. It goes to their ability to understand why they're being executed. The mental state that plaintiff is alleging, he does not allege is new. This mental state under the allegations in the complaint was existing during the Abderrachman litigation. He's not alleging. I'm sorry. What if the person was incompetent? Shortly after they were sentenced, they were incompetent. So the court still wants you to wait, right? Yes, Your Honor. For the purpose of seeing whether or not a mental condition could improve. But there are two different issues here. Even if the mental condition was not ripe at the time or was ripe at the time, the seizure condition was established and was ripe. For that reason, race judicata would certainly bar the seizure condition claim. And plaintiff has not alleged any facts showing that the mental condition as opposed to competency is a flexible condition that could have been or wasn't right at that point in time. Any further questions? Thank you. Thank you. I think there's five minutes of rebuttal. Thank you. Thank you. I apologize if I was beeping. I am the first time I've done this. And I was trying to look something up. And I clearly didn't follow the admonishment correctly to turn off notifications. What I was looking for was a term as applied in Abdurrahman. I couldn't find it. I stopped looking after a few beeps. But I don't believe the Tennessee Supreme Court addressed any as applied challenges in Abdurrahman. A few points. I think that it's dispositive as to the facial challenge that Tennessee does not contest that pentobarbital is readily implemented. I think that gets us as far as we need to go at this stage. Sorry, that Tennessee doesn't contest what? The attorney for the state of Tennessee said that they do not contest that pentobarbital is readily implemented as an alternative means of execution. I think that's dispositive at this stage. I also think it's dispositive at this stage when we're talking about a complaint that we hear the state of Tennessee saying we don't know who the supplier is. Well, that's a disputed fact. I think it's dispositive when they say that the United States has sources we don't. Again, that's a disputed fact. They appear to be arguing that Tennessee has a legitimate reason not to adopt a readily implemented method of execution, which under Bucklew, which is merely clarifying the law under Bucklew is something that we're going to inquire into later. That's something for the court to inquire into. It's not something for us to plead. But then I think the last thing that's absolutely dispositive, while I don't agree with the point, the answer resolves it. The state of Tennessee says that to plead a complaint that would meet their standards, we would have to identify a specific but unnamed supply. They said if we did that in our complaint, we would have done enough. Said we don't have to name them, but have to identify them. Paragraph 251, plenty in Europe, redacted source. And that's 2017. But paragraph 251 said there is a supplier in Europe with plenty. The state of Tennessee redacted that person's identity. Now that two states have gotten import licenses and a third state is applying for one, that source is now readily available. That's one source we've identified. Now saying that there's a source with plenty, is that saying enough? Don't you also have to say that the source is willing or able to make the drug available to Tennessee or that you've communicated with them and they will render that they're willing to offer up what's needed? Just to say that there's somebody in Europe that's got the drug, that doesn't sound like enough by any means. Well, Your Honor, I think under Bucklew, it's more than enough. But I also think it's important to note, this isn't me saying that there's somebody in Europe with plenty. This is the state of Tennessee in their own email saying there's plenty. And then the second one, October of 2019, so this post dates, there's a paragraph 160. It's possible we could order it, but getting it imported would be the issue. So again, we have another source that Tennessee has identified. They're redacting the identity of them, which Tennessee acknowledges they can do and we don't get to know who this redacted source is. But we've identified two people in our complaint. And again, the complaint stage, we're looking at whether we have made plausible allegations, plausible allegations that satisfy Bucklew. And we have to do that, I really think in light of white versus white. And we have to look at the minimal amount of new proof that is sufficient to overcome raised judicata. And if Mr. White being missing for five years was more than enough to overcome raised judicata, then I submit we've done more than enough. But I think that we can meet the challenge that Tennessee put for us because our complaint includes at least two sources being specifically identified. Now, to be clear, I don't think we needed to go that far. But paragraph 251 says as of August 2017, is that a problem for you? I don't think so. That existed when Abderrahman came down. Because when Abderrahman came down was when they still couldn't import Pento Barbitol. At that point, it was impossible to import. Now, with the issuance of the two licenses, and I submit with the United States Supreme Court removing two FDCA injunctions, it now clearly is plausible, much more than plausible, that they can import Pento from that very source. Your opponent says the D.C. Circuit opinion is still binding law. How do you respond to that? I believe the only way to reconcile what happened in Perky and Hall is the United States Supreme Court agreed with Judge Rao, who had found in dissent that the FDCA could not be used to regulate lethal injection drugs or executions. Certainly, it's hard to understand how the United States Supreme Court would overturn that injunction unless they believed, and I'm going to misstate the standard, but to overturn an injunction requires a finding that the plaintiffs had almost no chance of prevailing. And I apologize, I'm not saying the standard correctly. But it clearly is an endorsement of Judge Rao's position. And the reality is to get import licenses, the FDA is issuing import licenses. So I think that that's dispositive. My time is up. Obviously, I'll answer. How do you deal with the two unpublished cases? Is your answer, well, they're not presidential, or are they factually distinguishable? They're factually distinguishable. One of the two didn't allege any new facts. And it only argued legal exceptions to raise judicata. Sutton relied almost exclusively on the OLC opinion and did not allege any new facts either. Obviously, since Sutton was decided, we now have Perkey and Hall upholding the OLC opinion and the issuance of these licenses. So I think that they are very narrowly limited to the limited facts that were pled in those cases. We've pled much more. Any further questions? Thank you. Thank you both for your argument. We appreciate your doing this on Zoom. And we appreciate your thoughtful arguments. Thank you, Your Honor. This report is now adjourned.